Robert R. Ahdoot (SBN 172098)
*rahdoot@ahdootwolfson.com*
Tina Wolfson (SBN 174806)
*twolfson@ahdootwolfson.com*
Theodore Maya (SBN 223242)
*tmaya@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
310.474.9111 (*telephone*)
310.474.8585 (*facsimile*)

Andrew Ferich (*pro hac vice* to be filed)
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania 19087
310.474.9111 (*telephone*)
310.474.8585 (*facsimile*)

Erich P. Schork (*pro hac vice* to be filed)
*erichschork@robertslawfirm.us*
**ROBERTS LAW FIRM**
PO Box 31909
Chicago, IL 60631-9998
510.821.5575 (*telephone*)
510.821.4474 (*facsimile*)

Michael L. Roberts (*pro hac vice* to be filed)
*mikerobert@robertslawfirm.us*
**ROBERTS LAW FIRM**
1920 McKinney Avenue, Suite 700
Dallas, TX 75201
510.821.5575 (*telephone*)
510.821.4474 (*facsimile*)

*Counsel to Plaintiffs and the Proposed Class*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN SMITH, JACQUELINE MOONEY, ANGELA BAKANAS, and MATTHEW COLÓN, individually and on behalf of all others similarly situated, | Case No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| VCA, INC., and THE PLAN COMMITTEE FOR THE VCA, INC. SALARY SAVINGS PLAN, and JOHN AND JANE DOES 1-50, | |
| Defendants. | |

Plaintiffs Brian Smith, Jacqueline Mooney, Angela Bakanas, and Matthew Colón ("Plaintiffs"), individually and on behalf of similarly situated current and former participants in and beneficiaries to the VCA Inc. Salary Savings Plan (the "Plan"), by and through their attorneys, hereby allege as follows.

## I. NATURE OF THE ACTION AND INTRODUCTION

1. This is a class action brought pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA") for the benefit of the Plan and its participants and beneficiaries. This action asserts claims for breaches of fiduciary duties and other violations of ERISA under 29 U.S.C. §§ 1132(a)(2) and (3) between November 22, 2015 and July 24, 2020 (the "Class Period") against the Plan's fiduciaries, which include: VCA, Inc. ("VCA"); the Plan Committee for the VCA, Inc. Salary Savings Plan (the "Plan Committee"); and John and Jane Does 1-50 (collectively, "Defendants").

2. Every year, millions of employees entrust their retirement savings to plans established under ERISA, like the Plan. ERISA plans are supposed to be protected by their fiduciaries, who are obligated to act prudently to protect Plan participants and their hard-earned retirement dollars—the essential remedial purpose of ERISA.

3. ERISA fiduciaries have a continuing duty to evaluate fees and expenses assessed to a plan in order to make sure those charges are reasonable and prudent and remain as such.

4. ERISA fiduciaries' failures to monitor plan costs—such as plan recordkeeping and administration costs—for reasonableness have stark financial consequences for retirees. Every extra level or dollar of expenses imposed upon plan participants compounds over time and reduces the value of participants' investments available upon retirement.

5. The table below illustrates how fees impact retirement accounts over time[1]:

---

[1] See Investor Bulletin Mutual Funds Fees and Expenses, SEC, https://www.sec.gov/files/ib_mutualfundfees.pdf (last visited Nov. 22, 2021).



6.      The above table illustrates that where an employee invests $100,000 over 20 years with an assumed 4% annual rate of return and annual fees of 1.00%, the account balance in 20 years will be $180,000. This balance is $30,000, or 14%, less than the same investment where annual fees are only 0.25%, which would result in a balance of $210,000. This difference is substantial. The impact of excessive fees on defined contribution participants is even more substantial given that during most of the past three decades the returns of defined contribution participants have averaged nearly double (7%) the 4% depicted in the SEC table *supra*.[2]

7.      The impact of excessive or unreasonable fees on defined contribution plan participants' accounts is well-recognized. Indeed, one court recently noted:

> Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan. . . by decreasing its

---

[2] *See, e.g.*, Alicia H. Munnell, et al., *Investment Returns: Defined Benefit vs. Defined Contribution Plans*, CENTER FOR RETIREMENT RESEARCH AT BOSTON COLLEGE (Dec. 2015 No. 15-21), p. 3, Table 4, available at https://crr.bc.edu/wp-content/uploads/2015/12/IB_15-211.pdf.

CLASS ACTION COMPLAINT

immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.[3]

8.      ERISA imposes a strict fiduciary duty of prudence upon Defendants as Plan fiduciaries, pursuant to 29 U.S.C. § 1104(a). ERISA's fiduciary duties are among the highest duties known to the law, requiring fiduciaries to perform their obligations solely in the best interests of a plan's participants and beneficiaries. As fiduciaries to the Plan, Defendants were obligated to act for the exclusive benefit of Plan participants and beneficiaries, including ensuring that fees and expenses charged to the Plan were reasonable. Defendants had a continuing duty to evaluate Plan recordkeeping and administration fees and expenses to ensure such charges were reasonable and appropriate.

9.      Defined contribution retirement plans are often categorized in terms of the value of assets in the plan. For example, plans with less than $5 million in assets are often classified as "micro" plans, plans with between $5 and $50 million in assets are considered "small" plans, plans with assets between $50 and $200 million in assets are considered "mid" plans, and plans with greater than $200 million in assets are considered "large" plans.

10.     With 11,682 participants holding account balances and over $563 million in net assets as of December 31, 2019, based on publicly available Form 5500 data, the Plan is larger than 99.85% of defined contribution plans in terms of participants and larger than 99.72% of plans in terms of assets. As a result, the Plan is considered a "large" retirement plan.

11.     Because the marketplace for retirement plan administrative services is well-established and highly competitive, such services have become commoditized. Given that there was more than $500 million in assets in the Plan during the Class Period, the Plan had tremendous bargaining power to demand low-cost administrative and investment management services.

_____

[3] *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020) (internal citation and quotations omitted).

CLASS ACTION COMPLAINT

12.     Prudent plan fiduciaries continuously monitor plan recordkeeping and administrative fees to ensure those fees remain reasonable in relation to the services provided and competitive with those being assessed to analogous plans with similar assets and numbers of participants. Prudent plan fiduciaries periodically put plan recordkeeping services out for a competitive bidding process to ensure a plan is achieving a reasonable administrative fee structure.

13.     But instead of leveraging the Plan's substantial bargaining power to benefit Plan participants and beneficiaries, during the Class Period Defendants caused the Plan to pay unreasonable and excessive fees for retirement plan services in relation to the services being provided to the Plan.

14.     Upon information and belief, during the Class Period, Defendants breached their duties owed to the Plan, to Plaintiffs, and all other Plan Participants by:

a.     failing to monitor the retirement plan service fees paid by the Plan to ensure that they were reasonable and, as a result, authorizing the Plan to pay objectively unreasonable and excessive retirement plan service fees, relative to the retirement plan services received; and

b.     failing to take standard and customary actions to understand the market for retirement plan services to monitor for reasonableness the retirement plan service fees paid by the Plan in relation to the retirement plan services received.

15.     Throughout the Class Period, Defendants maintained, administered, and sponsored the Plan and were responsible for selecting, monitoring, and retaining third parties to provide investment, recordkeeping, and other administrative services.

16.     As the sponsor and administrator of the Plan, Defendants exercised discretionary authority and control over the Plan and constitutes a plan fiduciary as defined by 29 U.S.C. § 1002(21)(A). As the Plan's fiduciaries, Defendants were obligated to act for the exclusive benefit of Plan participants and to ensure the Plan's expenses were fair, reasonable, and appropriate.

17.    Defendants breached these fiduciary duties by allowing unreasonable and excessive recordkeeping and administrative fees to be charged to Plaintiff and other Plan participants.

18.    The Plan's objectively unreasonable retirement plan service fees cannot be justified. During the Class Period, the Plan paid as high as $105 per participant annually for retirement plan services. During the Class Period, reasonable retirement plan service fees for a plan of this size would have averaged $38 per participant annually.

19.    Defendants' failures to monitor retirement plan service fees and ensure their reasonableness breached the fiduciary duties they owed to Plaintiffs, Plan Participants, and beneficiaries. Defendants did not engage in prudent decision-making processes, as there is no other explanation for why the Plan paid objectively unreasonable fees for retirement plan services.

20.    Plaintiffs were injured by the Defendants' actions because Defendants permitted all Plan participants to be charged excessive retirement plan service fees, which reduced Plaintiffs' Plan account balances and caused them significantly diminished investment returns.

21.    To remedy Defendants' fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries in the Plan, bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to restore to the Plan all losses resulting from each breach of fiduciary duty, as alleged in more detail herein. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

22.    The allegations in this Complaint are based upon information and belief and an investigation by undersigned counsel, including, but not limited to, review of Plan filings with the United States Department of Labor ("DOL"). other publicly available documents, and other analytical investment data. Defendants have possession of additional material information relating to the claims herein, and Plaintiffs reserve the right to amend this Complaint as those materials become available in the course of this litigation.

## II.    JURISDICTION AND VENUE

23.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §§ 1001 *et seq*.

24.    This Court has personal jurisdiction over Defendants because at all relevant times, including during the Class Period, they transact business in this District, reside in this District, have significant contacts within this District, and because ERISA provides for nationwide service of process.

25.    This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District; the Plan is deemed to reside in this District; some or all of the ERISA violations alleged herein took place in this District; and the Plan can be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    THE PARTIES

### A.    PLAINTIFFS

**Plaintiff Brian Smith**

26.    Plaintiff Brian Smith (formerly Brian Boucher) ("Smith") is a resident of Salem, Oregon.

27.    Mr. Smith was a "participant" in the Plan, as that term is defined under 29 U.S.C § 1002(7), because he had a vested account balance in the Plan during the Class Period. Mr. Smith participated in the Plan through his employer, VCA, Inc. Mr. Smith was a participant in the Plan during the period of 2016-2020.

28.    Following the merger of the Plan into the Mars Plan, Mr. Smith's retirement account was relocated to the Mars Plan, and he remains a participant in that plan.

29.    During the Class Period, upon information and belief, Mr. Smith paid excessive recordkeeping fees directly and indirectly through revenue sharing.

30.    During the Class Period, Mr. Smith held investments in Plan investment

options that, upon information and belief, paid revenue sharing.

31.     During the Class Period, and per the Plan's public Form 5500s, Mr. Smith paid Prudential indirect compensation from certain funds in the Plan based on an undisclosed formula, the amount of which compensation is also undisclosed.

32.     Mr. Smith has Article III standing to bring this action on behalf of himself because he suffered an actual injury to his own individual Plan account, that injury is fairly traceable to Defendants' breaches of fiduciary duties in violation of ERISA, and the harm is likely to be redressed by a favorable judgment.

33.     Mr. Smith did not have knowledge of all material facts (including, among other things, the retirement plan service fees and total cost comparisons to similarly sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Mr. Smith lacked actual knowledge of reasonable fee levels and prudent fee alternatives available to the Plan.

34.     Mr. Smith currently is a participant in a retirement plan sponsored by Marion County, Oregon that is recordkept and administered by Voya. Mr. Smith discerns no noticeable difference in the level of services being provided to his current plan as compared to the services provided to the Plan by Prudential. Furthermore, Mr. Smith's Plan retirement account was merged into the Mars Plan. Mr. Smith discerns no noticeable difference in the level of services being provided to the Mars Plan by Fidelity as compared to the services provided to the Plan by Prudential. Mr. Smith has also come to realize that the services provided by Prudential to the Plan are virtually identical to the services that Fidelity is providing to participants in the Mars Plan.

**Plaintiff Jacqueline Mooney**

35.     Plaintiff Jacqueline Mooney (née Adams) ("Mooney") is a resident of Hudson, Massachusetts.

36.     Ms. Mooney was a "participant" in the Plan, as that term is defined under 29 U.S.C § 1002(7), because she had a vested account balance in the Plan during the Class

Period. Ms. Mooney participated in the Plan through her employer, VCA, Inc. Ms. Mooney was a participant in the Plan during the period of 2015-2017.

37.     During the Class Period, upon information and belief, Ms. Mooney paid excessive recordkeeping fees directly and indirectly through revenue sharing.

38.     During the Class Period, Ms. Mooney held investments in Plan investment options that, upon information and belief, paid revenue sharing.

39.     During the Class Period, and per the Plan's public Form 5500s, Plaintiff paid Prudential indirect compensation from certain funds in the Plan based on an undisclosed formula, the amount of which compensation is also undisclosed.

40.     Ms. Mooney has Article III standing to bring this action on behalf of herself because she suffered an actual injury to her own individual Plan account, that injury is fairly traceable to Defendants' breaches of fiduciary duties in violation of ERISA, and the harm is likely to be redressed by a favorable judgment.

41.     Ms. Mooney did not have knowledge of all material facts (including, among other things, the retirement plan service fees and total cost comparisons to similarly sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Ms. Mooney lacked actual knowledge of reasonable fee levels and prudent fee alternatives available to the Plan.

42.     Ms. Mooney currently is a participant in a retirement plan sponsored by Boston Analytical that is recordkept and administered by Fidelity. Ms. Mooney discerns no noticeable difference in the level of services being provided to her current plan as compared to the services provided to the Plan by Prudential.

**Plaintiff Angela Bakanas**

43.     Plaintiff Angela Bakanas ("Bakanas") is a resident of Lorton, Virginia.

44.     Dr. Bakanas was a "participant" in the Plan, as that term is defined under 29 U.S.C § 1002(7), because she had a vested account balance in the Plan during the Class

Period. Dr. Bakanas participated in the Plan through her employer, VCA, Inc. Dr. Bakanas was a participant in the Plan during the period of 2016-2020.

45. During the Class Period, upon information and belief, Dr. Bakanas paid excessive recordkeeping fees directly and indirectly through revenue sharing. During the Class Period, Dr. Bakanas held investments in Plan investment options that, upon information and belief, paid revenue sharing.

46. During the Class Period, and per the Plan's public Form 5500s, Plaintiff paid Prudential indirect compensation from certain funds in the Plan based on an undisclosed formula, the amount of which compensation is also undisclosed.

47. Dr. Bakanas has Article III standing to bring this action on behalf of herself because she suffered an actual injury to her own individual Plan account, that injury is fairly traceable to Defendants' breaches of fiduciary duties in violation of ERISA, and the harm is likely to be redressed by a favorable judgment.

48. Dr. Bakanas did not have knowledge of all material facts (including, among other things, the retirement plan service fees and total cost comparisons to similarly sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Dr. Bakanas lacked actual knowledge of reasonable fee levels and prudent fee alternatives available to the Plan.

49. Prior to departing her employment with VCA, Inc., from July 2020 until December 2020, Dr. Bakanas' retirement account was merged into the Mars Plan. During that time, Dr. Bakanas discerned no noticeable difference in the level of services being provided to the Mars Plan by Fidelity as compared to the services provided to the Plan by Prudential. Dr. Bakanas has come to realize that the services provided by Prudential when she was a participant in the Plan are virtually identical to the services that Fidelity provides to participants in the Mars Plan.

**Plaintiff Matthew Colón**

50. Plaintiff Matthew Colón ("Colón") is a resident of Mableton, Georgia.

51.     Mr. Colón was a "participant" in the Plan, as that term is defined under 29 U.S.C § 1002(7), because he had a vested account balance in the Plan during the Class Period. Mr. Colón participated in the Plan through his employer, VCA, Inc. Mr. Colón was a participant in the Plan during the period of 2015-2020.

52.     During the Class Period, upon information and belief, Mr. Colón paid excessive recordkeeping fees directly and indirectly through revenue sharing.

53.     During the Class Period, Mr. Colón held investments in Plan investment options that, upon information and belief, paid revenue sharing.

54.     During the Class Period, and per the Plan's public Form 5500s, Mr. Colón paid Prudential indirect compensation from certain funds in the Plan based on an undisclosed formula, the amount of which compensation is also undisclosed.

55.     Mr. Colón has Article III standing to bring this action on behalf of himself because he suffered an actual injury to his own individual Plan account, that injury is fairly traceable to Defendants' breaches of fiduciary duties in violation of ERISA, and the harm is likely to be redressed by a favorable judgment.

56.     Mr. Colón did not have knowledge of all material facts (including, among other things, the retirement plan service fees and total cost comparisons to similarly sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Mr. Colón lacked actual knowledge of reasonable fee levels and prudent fee alternatives available to the Plan.

57.     Mr. Colón currently is a participant in a retirement plan sponsored by Animal Wellness Clinic that is recordkept and administered by ADP. Mr. Colón discerns no noticeable difference in the level of services being provided to his current plan as compared to the services provided to the Plan by Prudential.

58.     The Plan also suffered harm caused by Defendants' fiduciary breaches and remains exposed to harm and continued future losses. The Plan is the victim of a fiduciary breach and will be the recipient of any recovery. Plaintiffs' claims are brought in a

representative capacity on behalf of the Plan as a whole and seek remedies under 29 U.S.C. § 1109 to protect the entire Plan. Plaintiffs and all participants and beneficiaries in the Plan suffered financial harm as a result of Defendants' imprudent and unreasonable fee decisions. That harm may be redressed by a judgment of this Court in favor of Plaintiffs.

59.     All Plaintiffs have suffered losses as a result of unreasonable fees paid for Plan services provided by Prudential.

**B.     DEFENDANTS**

60.     Defendant VCA Inc.[4] is a Delaware corporation with a principal place of business located at 12401 West Olympic Blvd., Los Angeles, California.

61.     Per the Plan's Form 5500 for 2020, VCA was the Plan Administrator under 29 U.S.C. § 1002(16)(A)(i) and the Plan Sponsor under 29 U.S.C. § 1002(16)(B).

62.     As the Plan Administrator, VCA was a fiduciary responsible for day-to-day administration and operation of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A). It had authority and responsibility for the control, management, and administration of the Plan in accordance with 29 U.S.C. § 1102(a). VCA had responsibility and discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to enable it to carry out such responsibilities properly, including the selection and compensation of the providers of recordkeeping and administrative services to the Plan. VCA acted through its officers, directors, and the other Defendants to perform Plan-related fiduciary functions in the course and scope of their business. VCA appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees.

63.     Defendant the Plan Committee for the VCA, Inc. Salary Savings Plan ("Committee") was, on information and belief, at all relevant times and during the Class Period, located at 12401 West Olympic Blvd., Los Angeles, California.

---

[4] In this Complaint, "VCA" or "VCA, Inc." refers to the named Defendant VCA, Inc. and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

64.     On information and belief, the Committee was the governing body responsible for the oversight and administration of the Plan and had authority to manage and control the administration and operation of the Plan, including with respect to selection and retention of recordkeeping and administrative services providers. The Committee and its members, in their individual capacities, exercised authority and control over Plan management and Plan assets, and thus are Plan fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A).

65.     Defendants John and Jane Does 1-50 are unknown individuals comprising of Defendants the Committee and any other Plan committees; any officers, directors, or employees of Defendant VCA; or other individuals or entities who are or were fiduciaries to the Plan, within the meaning of 29 U.S.C. § 1002(21)(A), during the Class Period. Plaintiffs reserve the right to seek leave to join these currently unknown individuals into the instant action once their identities are ascertained.

66.     All Defendants are Plan fiduciaries because they have exercised and continue to exercise discretionary authority or discretionary control respecting the management of the Plan and the management and disposition of its assets, and have discretionary authority or discretionary responsibility in the administration of the Plan. 29 U.S.C. § 1002(21)(A).

## IV.     VCA, INC. SALARY SAVINGS PLAN

67.     The name of the Plan is the VCA, Inc. Salary Savings Plan. The Plan's Employer Identification Number (EIN) is 95-4097995 and the Plan has been assigned the three-digit plan number 001.

68.     The Plan is and was subject to ERISA and, on information and belief, established and maintained under written documents in accordance with 29 U.S.C. § 1102(a)(1).

69.     The Plan was a defined contribution retirement plan, pursuant to 29 U.S.C. §§ 1002(2)(A) and 1002(34). In defined contribution plans, the value of a participant's retirement account is determined solely by, and thus is limited to, employee and employer contributions plus the amount gained through investment in the options made available in

the plan, less expenses. Employees contribute a percentage of their pre-tax earnings to the Plan through an individual account, which is invested in investment options chosen from an investment lineup selected by the Plan's fiduciaries.

70.    The Plan provides the primary source of retirement income for many employees of VCA, Inc. The ultimate amount of retirement benefits provided to Plan participants depends on the performance of investment options chosen for the Plan by Defendants, net of fees and expenses. Participants had the right to direct the investment of their account dollars to the available investment choices chosen by the Plan fiduciaries.

71.    According to the Plan's Form 5500 for the 2020 fiscal year, effective July 24, 2020, the Plan was merged into the Mars Veterinary Health 401(k) Savings Plan ("Mars Plan") and assets of $573,670,375 were transferred from the Plan's trustee Prudential Bank & Trust F.S.B. and the Plan's custodian Prudential Retirement Insurance and Annuity Company to Fidelity Management Trust Company.

72.    The majority of fees assessed to participants in a defined contribution plan are attributable to two general categories of services: retirement plan service fees (primarily comprised of recordkeeping and plan administration), and investment management fees. These expenses significantly reduce the value of an account in a plan. The Plan fiduciaries were required to control Plan expenses, including those associated with the service providers selected and hired to administer the Plan (e.g., recordkeepers). The Plan fiduciaries were also responsible for negotiating and approving fees paid to Plan service providers, whether directly or indirectly paid.

73.    Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, excessive fees can dramatically reduce the benefits available when the participant is ready to retire. Over time, even small differences in fees compound and can result in vast differences in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an

account in a defined-contribution plan." *Tibble v. Edison Int'l*, 575 U.S. 523, 135 S. Ct. 1823, 1825 (2015).

74. The impact of excessive fees on the Plan's employees' and retirees' retirement assets is dramatic. The Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career.[5]

75. Plan participants typically have little appreciation of the fees being assessed to their accounts. Indeed, according to a recent survey conducted by TD Ameritrade, of 1,000 investors, only 27% believed they knew how much they were paying in fees as participants in 401(k) plans.[6] It is incumbent upon plan fiduciaries to look out for plan participants, protect their retirement dollars, and make sure fees remain reasonable.

## V. FACTUAL BACKGROUND
### A. RETIREMENT PLAN SERVICES IN DEFINED CONTRIBUTION PLANS

76. Defined contribution plans, such 401(k)s, are the most common type of employer-sponsored retirement plan. Under defined contribution plans, the assets are generally held in a single trust and trust assets are allocated by a retirement plan services provider (often referred to as a "recordkeeper").

77. Fiduciaries of virtually all "large" defined contribution plans hire a single retirement plan services provider to provide the essential recordkeeping and administration ("RK&A") services necessary to offer the plan. RK&A services are necessary for defined contribution plans, and these services often include, but are not limited to: maintaining plan records; tracking participant account balances and investment elections; providing

---

[5] United States Dep't of Labor, *A Look at 401(k) Plan Fees*, at 1-2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

[6] *See* BUSINESSWIRE, *Three-Quarters of Americans Are in the Dark When it Comes to 401(k) Fees* (Jan. 29, 2018, 8:30 AM), https://www.businesswire.com/news/home/20180129005124/en/Three-Quarters-of-Americans-Are-in-the-Dark-When-it-Comes-to-401-k-Fees.

transaction processing; providing call center support and investment education and guidance; providing participant communications; and providing trust and custodial services.

78. Some retirement plan service providers provide purely recordkeeping, administration, and related services, while others are subsidiaries of financial services and insurance companies that distribute mutual funds, insurance products, and other investment options.

79. Retirement plan service providers typically offer the RK&A services as a bundle of services that are provided to all plan participants. Retirement plan service providers also charge separate additional fees for individual transactions and/or services that are utilized only by specific participants, e.g., loan initiation and maintenance fees. The fees charged for participant-specific services typically account for an insignificant portion of the total fees charged for providing retirement plan services and are not included in the bundled fee for the RK&A services provided to all plan participants.

80. Since the mid-2000s, the retirement plan services provided to "large" defined contribution plans, like the Plan, have increasingly become viewed by prudent plan fiduciaries as a commodity service. While recordkeepers in the defined contribution industry attempt to distinguish themselves through marketing and other means, most recordkeepers offer the same bundles and combinations of services as other competitor recordkeepers. As a result, the market for defined contribution retirement plan services is highly competitive, particularly for "large" plans that, like the Plan, have a sizable number of participants and a large amount of assets.

81. In recent decades, the fee retirement plan service providers have been willing to accept for providing retirement plan services has significantly decreased.

82. By the start of and during the entire Class Period, the level of fees that retirement plan service providers have been willing to accept for providing retirement plan services, including RK&A services, has stabilized and has not materially changed. In other

words, reasonable retirement plan service fees paid, e.g., in 2018, are representative of the reasonable fee for retirement plan services during the entire Class Period.

83.    Recordkeepers for larger defined contribution plans, like the Plan, experience efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants in the plan increases. This is because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans. When the number of participants increases in a defined contribution plan, the recordkeeper can spread the cost of providing retirement plan services over a larger participant base, reducing the average unit cost of delivering services on a per-participant basis. The larger the retirement plan, the more negotiating power a plan fiduciary has when negotiating recordkeeping and administrative fees.

84.    Moreover, the cost to a recordkeeper to provide retirement plan services to a participant does not materially differ from one participant to another and is not dependent on the balance of the participant's account. In other words, the average cost to provide retirement plan services is materially identical for a participant that has $10,000 and a participant that has $100,000 or $1,000,000 in plan assets.

85.    Therefore, while the total cost to provide retirement plan services increases as more participants join the plan, the cost per participant to deliver the retirement plan services decreases. Prudent plan fiduciaries and their consultants and advisors are aware of this cost structure dynamic for retirement plan providers.

86.    Sponsors of defined contribution plans negotiate and contract for retirement plan services separately from any contracts related to the selection of investment management services provided to plan participants.

87.    The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of retirement plan services that the recordkeeper provides on behalf of the investment manager.

88.     As a result, retirement plan service providers often make separate contractual arrangements with mutual fund providers. Retirement plan service providers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known in the defined contribution industry as "revenue sharing."

89.     For example, if a mutual fund has a total expense ratio fee of 0.75%, the mutual fund provider may agree to pay the retirement plan service provider 0.25% of the 0.75% total expense ratio fee that is paid by the investor in that mutual fund (in this context the Plan participant). That 0.25% portion of the 0.75% total expense ratio fee is known as the "revenue sharing."

90.     In the context of defined contribution plans, the amount of revenue sharing is deemed to be the amount of revenue paid by participants that is allocable to retirement plan services and, in some cases, other services provided to a plan. The difference between the total expense ratio and the revenue sharing is known as the "net investment expense." When a plan adopts prudent and best practices, the net investment expense is the actual amount a plan participant pays for the investment management services provided by a portfolio manager.

91.     Providers of retirement plan services, including RK&A services, typically collect their fees through direct payments from a plan or through indirect compensation such as revenue sharing, or some combination of both.

92.     Regardless of the pricing structure that the plan fiduciaries negotiate with the recordkeeper, the amount of compensation paid to the recordkeeper for the retirement plan services must be reasonable.

93.     Therefore, plan fiduciaries must understand the total dollar amounts being paid to their plan service provider(s) and be able to determine whether the compensation is reasonable by evaluating what the market is for the retirement plan services being received by the plan.

CLASS ACTION COMPLAINT

94.     Because retirement plan service fees are actually paid in dollars and because of the cost dynamic noted *supra*, the fees paid for retirement plan services are evaluated and compared on a dollars-per-participant basis.

95.     It is axiomatic in the retirement plan services industry that, all else being equal, a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis, and that as participant counts increase, the effective per-participant retirement plan service fee should decrease, assuming the same services are provided.

96.     At all times during the Class Period, several high quality recordkeepers provided the same identical bundle of services to plans of a similar size as the plan which included all of the following services:

        a.     recordkeeping;

        b.     transaction processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

        c.     administrative services related to converting a plan from one recordkeeper to another;

        d.     participant communications (including employee meetings, call centers / phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., summary plan descriptions and other participant materials);

        e.     plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

        f.     plan consulting services, including assistance in selecting the investments offered to participants;

        g.     accounting and reporting services, including the preparation of annual

reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

h.    compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of a plan is in compliance with legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm);

i.    compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules;

j.    loan processing;

k.    distribution services; and

l.    processing of qualified domestic relations orders.

**B.    STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING AND MONITORING RETIREMENT PLAN SERVICE PROVIDERS**

97.    Plan fiduciaries are required to fully understand all sources of revenue received by retirement plan service providers or recordkeepers. Fiduciaries must regularly monitor the revenue being paid to retirement plan service providers to ensure that the compensation received is and remains reasonable in view of the services being provided.

98.    The DOL has identified that employers are held to a "high standard of care and diligence" and must, among other duties, "[e]stablish a prudent process for selecting . . . service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided"; and "[m]onitor . . . service providers once selected to make sure they continue to be appropriate choices."[7]

99.    The duty to evaluate and monitor plan service provider fees includes those fees directly paid by participants, because "[a]ny costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid

---

[7] *See A Look at 401(k) Plan Fees*, *supra*, note 5.

by plan participants."[8] *See also Tibble v. Edison Intern.*, 575 U.S. 523, 525 (2015) ("Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan.")

100.   Prudent fiduciaries will ensure that a plan is paying no more than reasonable fees for retirement plan services—including for RK&A services—by periodically soliciting competitive bids from retirement plan service providers to perform the same services currently being provided to the plan. For plans with many participants, like the Plan, most retirement plan service providers would require only the number of participants and the amount of the assets to provide a quote for retirement plan services, while others might only require the number of participants.

101.   Prudent fiduciaries have all this information readily available and can easily receive a quote from other retirement plan service providers to determine if the current level of fees being charged to the plan is reasonable.

102.   Having received bids, a prudent fiduciary can negotiate with its current provider for a lower fee or move to a new provider to provide the same (or better) services for a competitive reasonable fee. Prudent fiduciaries follow this same process to monitor the fees of retirement plan advisors and/or consultants as well as any other covered service providers, and do so on a periodic basis (e.g., three- or five-year increments).

103.   After the revenue requirement is negotiated, the plan fiduciary determines how to pay the negotiated retirement plan service fee. The employer can pay the retirement plan service fees on behalf of participants, which is the most beneficial to plan participants. If the employer is paying the fee, the employer would have an interest in negotiating the lowest fee a suitable recordkeeper would accept. Typically, however, the employer decides to have the plan (i.e., participants) pay the retirement plan service fees. If the retirement plan service fees are paid by participants, the fiduciaries can allocate the negotiated

---

[8] INVESTMENT COMPANY INSTITUTE, *The Economics of Providing 401(k) Plans: Service, Fees, and Expenses*, at 4-5 (June 2018), https://www.ici.org/pdf/per24-04.pdf.

retirement plan service fees among participant accounts at the negotiated per-participant rate, or pro rata based on account values, among other less common ways.

104.   In other words, if a plan negotiates a per-participant revenue threshold, e.g., $50.00, the plan does not need to require that each participant pay $50.00. Rather, the fiduciaries could determine that an asset-based fee is more appropriate for participants and allocate the retirement plan service fees pro rata to participants. For example, a 10,000-participant plan with a $50.00 revenue threshold would pay $500,000 for retirement plan services. If the plan had $500,000,000 in assets, then the $500,000 would work out to 10 basis points. Accordingly, the plan could allocate the $500,000 to participants by requiring that each participant pay 10 basis points.

105.   In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the plan. This structure creates situations in which the retirement plan services provided by the recordkeeper do not change but, because of market appreciation and contributions to the plan, the revenue received by the recordkeeper increases. This structure was historically preferred by recordkeepers because it allowed recordkeepers to obtain an increase in revenue without having to ask the client to pay a higher fee.

106.   In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's recordkeeper putatively for providing marketing, RK&A, and sometimes other retirement plan services on behalf of the mutual fund. These fees include: 12b-1 fees, which are paid by the funds to the recordkeeper as compensation for its services and expenses in connection with the sale and distribution of fund shares; shareholder service fees; and sub-transfer agency fees.

107.   Because revenue sharing payments are asset based, they bear no relation to the actual cost to provide services or the number of plan participants and can result in payment of unreasonable retirement plan service fees.

108.   Because revenue sharing arrangements pay recordkeepers asset-based fees, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue from any source (including revenue sharing payments) that exceeds a reasonable retirement plan service fee based on the market rate for the same services.

109.   The standard of care outlined above was well-known and well-established prior to the Class Period among prudent plan fiduciaries based on DOL guidelines, case law, and best practices as shared by retirement plan professionals. For example, the standard of care exercised by prudent retirement plan professionals was described by Mercer Investment Consulting, a prominent retirement plan investment consultant, and included, but was not limited to, the following:

  a. "Price administrative fees on a per-participant basis."

  b. "Benchmark and negotiate recordkeeping and investment fees separately."

  c. "Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size."

  d. "Benchmark and negotiate recordkeeping and trustee fees at least every other year."

  e. "Review services annually to identify opportunities to reduce administrative costs."[9]

110.   Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs.

111.   First, fiduciaries must pay close attention to the recordkeeping fees being paid by the plan. A hypothetical prudent fiduciary tracks the recordkeeper's expenses by

---

[9] "Fiduciary Best Practices," *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer Investment Consulting, at 3-4 (2013).

demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

112.   Second, to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent hypothetical fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

113.   Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will often include conducting a request for proposal ("RFP") process at reasonable intervals. More specifically, it was understood that the best practice standard of care was that an RFP should be issued once every three to five years.

114.   That said, by merely soliciting bids from other retirement plan service providers (without even resorting to an RFP process), plan fiduciaries can quickly and easily gain an understanding of the current market for materially identical retirement plan services and determine a starting point for negotiation. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids through some process, be it formal or informal, that provides an incentive to retirement plan service providers to provide a competitive bid.

115.   All of these standards are accepted and understood by prudent plan fiduciaries and were, or should have been, understood by Defendants at all times during the Class Period. This is because prudent fiduciaries understand that excessive fees significantly impact the value of participants' retirement accounts.

**C.    THE PLAN IMPRUDENTLY PERMITTED EXCESSIVE RETIREMENT PLAN SERVICE FEES TO BE PAID TO PRUDENTIAL**

116.    At all relevant times, the Plan's retirement plan service fees were excessive when compared with other similar-size plans receiving materially identical services. The fees charged to the Plan were excessive relative to the retirement plan services received by the Plan. These excessive fees led to lower net returns, depleting and substantially reducing Plaintiffs' and Plan participants' retirement savings.

117.    Between 2015 and 2020, Plan participants paid for retirement plan services directly through fees deducted from their accounts and indirectly through revenue sharing. From at least 2015, each Plan participant paid a retirement plan service fee, on average, of $91+ per year deducted directly from their accounts. This amount alone is more than double the reasonable retirement plan service fee for a plan this size.

118.    In addition to collecting, on average, $91+ per year from each Plan participant by directly extracting the fee from participant accounts, the Plan (i.e., the participants) paid additional retirement plan service fees indirectly through revenue sharing.

119.    During the Class Period, the Plan disclosed payment of the following direct compensation to Prudential Retirement Insurance and Annuity Company ("Prudential") in Schedule C of the Plan's Forms 5500:

- 24 -

| Compensation to Prudential Retirement Insurance and Annuity Company (source: Forms 5500, Schedule C) | |
|---|---|
| **Plan Year** | **Direct** |
| 2015 | $399,374 |
| 2016 | $735,820 |
| 2017 | $873,108 |
| 2018 | $1,114,861 |
| 2019 | $1,171,131 |
| 2020 (end 7/24) | $1,026,614 |
| **Total** | **$5,320,908** |

120.   During the Class Period, and per the Plan's public Form 5500s, Prudential also received indirect compensation from certain funds in the Plan based on an undisclosed formula, the amount of which compensation is also undisclosed.

121.   During the Class Period, the Plan paid over $1 million in retirement plan service fees per year in multiple years, and just under it in other years.

122.   During the Class Period, Plaintiffs and Plan participants paid between $59 and $105 in retirement plan service expenses per year. In the final Plan year, 2020, where there were only services provided to the Plan until July 24, or for approximately 7 months in the year, Plan participants still paid $88. There is no prudent explanation for why the Plan paid over $1 million in recordkeeping and administrative expenses in 2020 for 7 months, when the year prior in 2019, the Plan paid only slightly more ($1,171,131) in expenses for a full year of Prudential's services.

123.   The table below shows the actual and average yearly per-participant

CLASS ACTION COMPLAINT

retirement plan service fees paid by the Plan[10]:

| Retirement Plan Service (RPS) Fees Per-Participant Cost | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Plan Year | | | | | | |
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | ***Average*** |
| **Participants** | 6,730 | 8,285 | 9,449 | 10,653 | 11,682 | 11,682[11] | ***9,747*** |
| **RPS Fees** | $399,374 | $735,820 | $873,108 | $1,114,861 | $1,171,131 | $1,026,614 | ***$886,818*** |
| **Per-Participant RPS Fee** | $59 | $89 | $92 | $105 | $100 | $88 (7 months) | ***$91*** |

124.    The table illustrates that the Plan had on average 9,747 participants and paid an average effective annual RK&A fee of approximately $886,818, which equates to an average of approximately $91 per participant, per year. Notably, Plan year 2020 ended on July 24, 2020 due to the Plan being merged into the Mars Plan. Running the 2020 Plan Year to the end of 2020 and assuming the same monthly retirement plan services fees (($1,026,614/7) x 12) yields a hypothetical fee for Plan year 2020 in the amount of $1,759,910, making the hypothetical 2020 full-year per-participant fee much higher—

---

[10] The RPS fees set forth in the table are conservative and likely to be lower than the actual RPS fees paid by plaintiffs as the amounts in the table only include direct compensation and conservatively assume that Prudential returned all indirect compensation to the plan.  It is likely, however, that Prudential did retain some of the indirect compensation it received from the Plan.  Because the Plan Fiduciaries did not disclose the amount of indirect compensation Prudential received from the Plan in its Form 5500s, discovery will be necessary to determine the additional compensation received by Prudential.

[11] The Plan's Form 5500 for Plan year 2020 reflects zero active balances in the Plan due to the merger of the Plan into the Mars Plan (*see* ¶ 41, *supra*) in mid-2020. The number of participants with active balances in the Plan at the time it was merged into the Mars Plan is not disclosed. Plaintiffs have utilized the 2019 figure for demonstrative purposes.

roughly $151 using the 2019 participant population of 11,682. Using this $151 figure for 2020 yields an average RPS fee of $1,009,034, which, using the 9,747 average participant number, yields an even higher average per participant fee of $104.

125.   Whether $91 or the hypothetical $104 per participant figure derived from running out Plan year 2020 until the end of the year, the fees charged to the Plan were exorbitant and unreasonable. Defendants' decision to maintain a retirement plan services relationship with Prudential during the Class Period in which Plan participants were paying on average $91 (or higher) per person per year was imprudent. This high per-participant retirement plan service expense is not in line with the fees paid by participants in other similar plans administered by prudent fiduciaries receiving materially identical services.

126.   The table above also reflects that retirement plan service fees for the Plan did not decline in correlation with the year-over-year increase of Plan participants, which grew from 6,730 to, on information and belief, more than 12,000 over a six-year period. The cost of adding participants to a recordkeeping platform is relatively low, and when participant numbers grow, the unit cost of delivering services on a per-participant basis should decrease. This inverse correlation of participants to the effective annual per participant retirement plan service fees was not manifested in the Plan during the Class Period. Prudent fiduciaries should have been able to achieve a decrease in the annual per-participant retirement plan service fee as the number of participants in the Plan grew, but Defendants failed to do so.

127.   The Plan's fiduciaries were required to continuously monitor retirement plan service fees, and to regularly solicit competitive bids to ensure fees paid to Prudential were reasonable. However, Defendants failed to employ prudent processes for ensuring that fees were and remained reasonable. To the extent there was a process in place that was followed by Defendants, it was imprudent and ineffective given the objectively unreasonable fees paid for retirement plan services.

128.   Due to Defendants' fiduciary failures and the absence of prudent fiduciary processes to monitor fees for reasonableness, the Plan's retirement plan service fees were

significantly higher than they would have been had Defendants engaged in prudent processes, and they were significantly higher than retirement plan service fees assessed to participants in similar plans receiving materially identical services.

129.   The table below illustrates the effective annual per participant retirement plan service fees paid in 2018 by other comparable plans with similar numbers of participants derived from Form 5500 filings, compared to the average effective annual per participant retirement plan service fee paid by the Plan (as identified in the table above) during the Class Period.

| Comparable Plans' Retirement Plan Service Fees Based on Publicly Available Information from Form 5500[12] | | | | | | |
|---|---|---|---|---|---|---|
| Plan | Participants | Assets | RPS Fee | RPS Fee /pp | Recordkeeper | Graph Color |
| Smithfield Foods, Inc. Salaried 401(k) Plan | 6,149 | $500,178,777 | $278,907 | $45 | Great-West | White |
| Flowserve Corporation Retirement Savings Plan | 6,395 | $892,435,613 | $263,380 | $41 | T. Rowe Price | White |
| Amn Healthcare 401(k) Retirement Savings Plan | 7,842 | $150,702,674 | $335,110 | $43 | Prudential | White |
| The Boston Consulting Group, Inc. Employees' Savings Plan and Profit Sharing Retirement Fund | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard | White |
| Stifel Financial Profit Sharing 401(k) Plan | 8,342 | $1,055,616,858 | $267,697 | $32 | Prudential | White |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,902 | $904,717,349 | $322,496 | $36 | Fidelity | White |

[12] Price calculations are based on 2018 Form 5500 information or the most recent Form 5500 if 2018 is not available. The RPS Fee for each comparable plan is calculated by adding the disclosed direct compensation plus the portion of indirect compensation retained by the recordkeeper. The total indirect compensation for each comparable plan is estimated by identifying the funds in each Plan that pay revenue sharing and calculating the total annual amount of revenue sharing generated by each plan. The portion of the revenue sharing that is retained by the recordkeeper for each comparable plan is determined based on information disclosed in each comparable plan's respective Form 5500s and the notes to each plan's financial statements provided by each plan's auditor.

| | | | | | | |
|---|---|---|---|---|---|---|
| Children's Medical Center Of Dallas Employee Savings Plan 403(b) | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity | White |
| Ralph Lauren Corporation 401(k) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price | White |
| Vibra Healthcare Retirement Plan | 9,750 | $107,652,510 | $277,532 | $28 | Great-West | White |
| **VCA Inc. Salary Savings Plan Average Fee** | **9,747** | **$436,931,392** | **$886,818** | **$91** | **Prudential** | **Red** |
| Centerpoint Energy Savings Plan | 9,802 | $2,108,802,293 | $442,946 | $45 | Voya | White |
| Republic National 401(k) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West | White |
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | White |
| Flowers Foods, Inc. 401(k) Retirement Savings Plan | 10,789 | $607,338,501 | $532,282 | $49 | Great-West | White |
| Multicare Health System 403(B) Employee Savings Plan | 11,437 | $559,801,095 | $556,202 | $49 | Transamerica | White |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity | White |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | $483,191 | $33 | Fidelity | White |

130.   Similarly, the graph below illustrates the average annual retirement plan service fee paid by the Plan compared to the effective annual per participant retirement plan service fee paid by the plans identified in the table above for materially identical services, with the white data points representing retirement plan service fees that recordkeepers offered to (and were accepted by) the comparable Plans:



131.   As the above graph makes clear, during the Class Period both smaller plans (for which the reasonable retirement plan service fees are higher) and plans of a comparable size to the Plan paid significantly lower per-participant retirement plan service fees than the Plan, including other plans which use Prudential as recordkeeper.

132.   This graph illustrates that other retirement plan service providers as well as the Plan's own recordkeeper would have accepted much lower retirement plan service fees for the identical services received by the Plan.

133.   All the comparable plans received at least all the services set forth in paragraph 96, *supra*.

134.   Prudential did not provide any different or unique services in addition to the services set forth above to warrant any additional fees.

135.   The service provided by Prudential as Plan recordkeeper did not justify paying on average more than two times the reasonable rate for materially identical retirement plan services.

136.   Plan sponsors can cap the amount each plan participant pays as a fee for recordkeeping and administration, but on information and belief, Defendants failed to do so.

137.   Had Defendants been acting in the exclusive best interest of the Plan's participants and engaged in prudent processes for selecting and negotiating with retirement plan service providers, rather than paying an effective average of at least $91 per participant per year in retirement plan service fees during the Class Period, the Defendants would have put retirement plan services out for periodic bidding and would have identified and negotiated with a market-competitive service provider that would have accepted on average around $38 per participant per year for the Plan.

138.   The $91 per-participant-per-year average is more than two times the amount charged to participants in similar plans where prudent fiduciaries have established and maintained a prudent recordkeeping setup. Prudent fiduciaries would have never initially agreed to the retirement plan service fees being assessed to the Plan participants starting in 2015, nor would prudent fiduciaries have permitted the unreasonable retirement plan service fees to continue in perpetuity.

139.   During the Class Period, Fidelity, Vanguard, Empower, T. Rowe Price, Voya and Transamerica, among others, all offered the identical package of services set forth in paragraph 96 *supra* at a materially identical or superior level of quality as those provided by Prudential to the Plan.

140.   Defendants did not regularly and/or reasonably assess the Plan's retirement plan service fees being paid to Prudential. Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the retirement plan service fees it paid to Prudential vis-à-vis the fees that other retirement plan service providers would charge for the same services.

141.   Defendants knew or should have known that ERISA's duty of prudence required them to engage in processes to evaluate the Plan's retirement plan service fees, but Defendants simply failed to do so. Had Defendants done so, they would have realized

that the Plan was compensating Prudential unreasonably and inappropriately in view of the Plan's size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and the Plan participants, and that the fees were excessive relative to the services received.

142.   Defendants' failure to recognize that the Plan and its participants were grossly overcharged for retirement plan service fees and their failure to take effective remedial actions shows a lack of or a complete disregard for a prudent process and was a breach of their fiduciary duties to Plaintiffs and the Plan participants.

143.   Defendants imprudently failed to monitor and control the compensation paid by the Plan for retirement plan services received by the Plan's recordkeeper.

144.   Had Defendants conducted an RFP for recordkeeping services or merely solicited competitive bids, they would have learned (as demonstrated by the charts above) that other recordkeeping providers, as well as Prudential, offered the same or similar recordkeeping and administrative services provided by Prudential for less than half of what the Plan paid in direct compensation. Defendants' failure to conduct an RFP for many years and during the Class Period was a breach of their fiduciary duty to prudently monitor Plan fees and assure such fees were reasonable, and caused harm to the Plan and its participants.

145.   As alleged herein, Defendants' failure to control costs for retirement plan services was a result of its imprudent processes, or lack of processes, for controlling these costs.

146.   Based on fees paid by other large plans receiving materially identical recordkeeping and administrative services, some of which used the same service provider, it is reasonable to infer that the Plan's fiduciaries failed to follow a prudent process to ensure that the Plan was paying only reasonable fees. In light of the amounts remitted to Prudential throughout the Class Period, Defendants clearly either engaged in virtually no examination, comparison, or benchmarking of the recordkeeping and administrative fees of the Plan to those of other similarly sized defined contribution plans, or they were complicit in paying grossly excessive fees.

147.   Defendants' failure to recognize that the Plan and its participants were grossly overcharged for retirement plan services and their failure to take effective remedial actions amounts to a breach of their fiduciary duties to the Plan. To the extent Defendants had a process in place, it was imprudent and ineffective given the objectively unreasonable level of fees the Plan paid for recordkeeping and administrative services. Had Defendants appropriately monitored the compensation paid to Prudential and ensured that participants were only charged reasonable recordkeeping fees, Plan participants would not have lost millions of dollars in their retirement savings over the last six-plus years.

148.   Had Defendants followed a prudent process to monitor the compensation paid to the Plan's recordkeeper, the Defendants would have identified several other quality recordkeepers who would have agreed to provide the materially identical recordkeeping services to the Plan for an effective fee of, on average, around $38 per participant and/or Prudential would have agreed to decrease its fee to, on average, an effective fee of around $38 per participant.

149.   Had Defendants monitored the compensation paid to the Plan's recordkeeper and ensured that participants were only charged reasonable fees for administrative and recordkeeping services, Plan participants would not have lost millions of dollars in their retirement savings over the last six years.

## VI.     ERISA'S FIDUCIARY STANDARDS

150.    Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or the other direct compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

151.    Defendants are Plan fiduciaries. ERISA imposes a strict fiduciary standard of prudence on Defendants as Plan fiduciaries. 29 U.S.C. § 1104(a)(1) provides in relevant part:

(a)     Prudent man standard of care

(1)   . . . a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A)  for the exclusive purpose of:

(i)   providing benefits to participants and their beneficiaries; and

(ii)  defraying reasonable expenses of administering the plan; [and]

(B)   with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;

* * *

(D)   in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA].

152.   29 U.S.C. § 1103(c)(1) provides in relevant part:

[T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

- 34 -

CLASS ACTION COMPLAINT

153.   ERISA fiduciary duties are the highest known to the law and must be performed with an eye exclusively to the interests of participants. ERISA fiduciaries exercising authority or control over plan assets, including the selection of plan service providers, must act prudently and for the exclusive benefit of participants in the plan, and not for the benefit of others, including service providers to the Plan such as recordkeepers or firms who provide investment products and services. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. § 1103(c)(1).

154.   Defendants' fiduciary duties apply continuously in the administration of the Plan and do not abate upon the engagement of service providers. Fiduciaries must ensure that the amount of fees paid to service providers is reasonable, and they have an ongoing duty to monitor fees being paid to plan service providers for reasonableness.

155.   ERISA also imposes co-fiduciary liabilities on Plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
> >
> > (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

156.   29 U.S.C. § 1132(a)(2) of ERISA authorizes a participant to bring a civil action under 29 U.S.C. § 1109(a), which provides:

CLASS ACTION COMPLAINT

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

157.   ERISA Section 1132(a)(3) authorizes a participant to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to address such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

## VII.   CLASS ACTION ALLEGATIONS

158.   Pursuant to 29 U.S.C. § 1132(a)(2), ERISA authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109(a).

159.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan.

160.   Pursuant to Federal Rules of Civil Procedure 23, Plaintiffs bring this action on behalf of, and seek to certify and be appointed as representatives of, the following class (the "Class"):

All participants in and beneficiaries to the VCA Inc. Salary Savings Plan from November 22, 2015, through July 24, 2020.

161.   Excluded form the Class are Defendants, any Plan fiduciaries, and the Judge assigned to this case. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

162.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

163.   **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that many thousands of persons comprise the Class. Per Form 5500 filed with the DOL for the Plan year ending December 31, 2019, the Class included at least 11,682 individual Plan participants.

164.   **Existence and Predominance of Common Questions of Law and Fact**: Common questions of law and fact exist as to all members of the Class because Defendants owed fiduciary duties to the Plan and to all Plan participants and beneficiaries, and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

      a.    whether the fiduciaries are liable for the remedies provided by 29 U.S.C. § 1109(a);

      b.    whether Defendants were fiduciaries to the Plan under ERISA;

      c.    whether Defendants breached fiduciary duties to the Plan in violation of ERISA;

      d.    whether the Plan and Plan participants are entitled to damages or monetary relief as a result of Defendants' breaches of fiduciary duties;

      e.    if so, the amount of damages or monetary relief that should be provided to the Plan and its participants; and

      f.    whether the Plan and its participants are entitled to any other relief as a result of Defendants' breaches and conduct alleged herein.

165.   Given that Defendants have engaged in a common course of conduct as to Plaintiffs and the Class, similar or identical injuries and violations are involved, and

common questions far outweigh any potential individual questions.

166. **Typicality**: All of Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were participants during the Class Period and all Plan participants were harmed by the uniform acts and conduct of Defendants discussed herein. Plaintiffs, all Class members, and the Plan sustained monetary and economic injuries including, but not limited to, ascertainable losses in retirement income and retirement account value, arising out of Defendants' breaches of their fiduciary duties to the Plan.

167. **Adequacy:** Plaintiffs are adequate representatives for the Class because their interests do not conflict with the interests of the Class that they seek to represent; they were participants in the Plan during the Class Period; and they are committed to vigorously representing the Class. Plaintiffs have retained counsel competent and highly experienced in complex class action litigation – including ERISA and other complex financial class actions – and counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

168. **Superiority:** A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small, and it would be impracticable for individual members to enforce their rights through individual actions. Even if Class members could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, the records (including databases, e-mails, etc.) that Defendants maintain regarding the Plan. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of

this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

169.  Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

## VIII.  CAUSES OF ACTION

<u>COUNT I</u>
**29 U.S.C. § 1104 - Breach of Duty of Prudence**
**Imprudent and Unreasonable Retirement Plan Service Fees**
**(On Behalf of Plaintiffs and the Class)**

170.  Plaintiffs incorporate the above allegations as if fully set forth herein.

171.  Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

172.  29 U.S.C. § 1104 imposes fiduciary duties of prudence upon Defendants in their administration of the Plan.

173.  Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges reasonable retirement plan service fees.

174.  During the Class Period, Defendants had a fiduciary duty to do all of the following:

   a.  ensure that the Plan's retirement plan service fees were reasonable;

   b.  manage the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries;

   c.  defray reasonable expenses of administering the Plan; and

   d.  act with the care, skill, diligence, and prudence required by ERISA.

175.  During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

176.   During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including Plaintiffs, by:

      a.     allowing the Plan to pay multiples of the reasonable per participant amount for the Plan's retirement plan service fees;

      b.     failing to properly disclose the fees charged to Participants in the Plan in their quarterly statements or fee disclosures;

      c.     failing to defray reasonable expenses of administering the Plan; and

      d.     failing to act with the care, skill, diligence, and prudence required by ERISA.

177.   During the Class Period, Defendants breached their duty to Plan participants, including Plaintiffs, by failing to employ or follow a prudent process to critically or objectively evaluate the cost and performance of the Plan's recordkeeper in comparison to other recordkeeping options.

178.   Through these actions and omissions, Defendants breached their fiduciary duties of prudence with respect to the Plan in violation of 29 U.S.C. § 1104(a)(1)(A).

179.   Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

180.   As a result of Defendants' breach of fiduciary duties, Plaintiffs and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

181.   Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3).

## COUNT II

### Failure to Adequately Monitor ERISA Fiduciaries
### Imprudent and Unreasonable Retirement Plan Service Fees
### (On Behalf of Plaintiffs and the Class)

182.   Plaintiffs incorporate the above allegations as if fully set forth herein.

183.   Defendants had the authority to appoint and remove individuals responsible for retirement plan service fees for the Plan and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

184.   In light of this authority, Defendants had a duty to monitor those individuals responsible for overseeing retirement plan service fees for the Plan to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

185.   Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

186.   Defendants breached their fiduciary duties by, among other things:

    a.   Failing to monitor and evaluate the performance of individuals responsible for retirement plan service fees for the Plan or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high retirement plan service fees and expenses;

    b.   Failing to monitor the process by which Plan recordkeepers were evaluated and failing to investigate the availability of lower-cost recordkeepers;

    c.   Failing to remove individuals responsible for overseeing and monitoring the Plan's service providers and retirement plan service

- 41 -

provider fees, including those individuals responsible for maintaining Prudential as recordkeeper at the current level of fees being paid to it, or altogether, which was imprudent and excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

187.   As the consequences of the foregoing fiduciary breaches, Plaintiffs and Plan participants suffered unreasonable and unnecessary monetary losses.

188.   Pursuant to 29 U.S.C. § 1109(a) and § 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor individuals responsible for retirement plan service fees for the Plan. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.   A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

C.   A Declaration that Defendants have breached their fiduciary duties under ERISA;

D.   An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from the failure to properly monitor and control retirement plan service fees, and restoring to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.   An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

F.   Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan

fiduciaries deemed to have breached their fiduciary duties;

G.    An award of pre-judgment interest;

H.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.    Such other and further relief as the Court deems equitable and just.

## IX.  NOTICE PURSUANT TO ERISA SECTION 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned affirms, that upon this filing of this Class Action Complaint with redactions as approved by the Court, a true and correct copy of this Class Action Complaint will be served upon the Secretary of Labor and the Secretary of Treasury by certified mail, return receipt requested.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

DATED: November 22, 2021        Respectfully submitted,

*/s/ Robert R. Ahdoot*
Robert R. Ahdoot (SBN 172098)
*rahdoot@ahdootwolfson.com*
Tina Wolfson (SBN 174806)
*twolfson@ahdootwolfson.com*
Theodore Maya (SBN 223242)
*tmaya@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
310.474.9111 (*telephone*)
310.474.8585 (*facsimile*)

Andrew Ferich (*pro hac vice* to be filed)
*aferich@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania 19087
310.474.9111 (*telephone*)
310.474.8585 (*facsimile*)

Michael L. Roberts (*pro hac vice* to be filed)
**ROBERTS LAW FIRM**
*mikerobert@robertslawfirm.us*
1920 McKinney Avenue, Suite 700

CLASS ACTION COMPLAINT

Dallas, TX 75201
510.821.5575 (*telephone*)
510.821.4474 (*facsimile*)

Erich P. Schork (*pro hac vice* to be filed)
*erichschork@robertslawfirm.us*
**ROBERTS LAW FIRM**
PO Box 31909
Chicago, IL 60631-9998
510.821.5575 (*telephone*)
510.821.4474 (*facsimile*)

*Counsel to Plaintiffs and the Proposed Class*